found not compensable. They've made that finding a few weeks prior to this court's decision in City of Springfield v. Industrial Commission, which, as I point out in my brief, indicated that although a claimant's work activities may be varied, they can still be sufficiently repetitive to constitute a compensable claim. In this particular case, the Commission found that the claimant failed to prove her work activities were sufficiently repetitive or strenuous to have increased the risk of aggravation of the degenerative and progressive condition of her knees. They further stated that while the job did involve some squatting and kneeling, her work activities were varied, and because they were varied, it was not a compensable claim. The arbitrator had originally found that the claimant had never complained of or experienced any pain while working. That was an issue that was changed by the Commission. So the facts before this court today are that as the claimant was working, she was experiencing pain and difficulties. I'm not going to get into an in-depth analysis of the type of work she did. It's set forth in our brief. Suffice it to say, she worked for Hart Schaffner and Marks for 32 years, and prior to this incident, she worked for 20 years as the receiving clerk. As the receiving clerk, bundles of industrial-sized fabric would come into her in carts called nest tainters. We're familiar with all of that. Let's get to the crux of it here.  You have two doctors that seem to support an aggravation of her knees, right? Yes, Your Honor. Okay. And you have one at the arbitrator, well, one on the other side. Right. Dr. Levin. Right. Now, Terry was dismissed by the arbitrator, right? Yes. Okay. Because Terry didn't seem to have, according to the arbitrator, a complete and full description of her work duties. Am I correct? That's correct. Okay. Now, why would that be? Why would Terry not have that? Well, Dr. Terry did have that. Dr. Terry testified that the claimant showed him the five photographs in Petitioner's Exhibits 1 through 5 of her workstation, of the workstation that she had to push along, of the nest tainters that she worked at. And he also testified that they had a very detailed discussion of her work activities and what the job entailed. How about that machine that tested fabric, sponging or something like that? The testing machine where she would depress the pedal with her right foot several times throughout the course of the day. There was discussion had concerning that, and she also testified that she did that across her knee. Well, that's her testimony, but I'm talking about Dr. Terry. It seems like you've got a doctor there that seems to give you some very supportive medical opinions. Yes. Okay. But yet the arbitrator says, oh, well, it's not really a full and complete description of what she was doing. And he went even further and said it was conjecture, that his opinions were pure conjecture. Well, he had the same – I guess what I'm saying is, is that a lawyering issue? Is that the arbitrator missed that? I believe that the arbitrator missed that. I'm certainly not beyond the possibility of not having fully done everything I could have done. But at the same time, in this particular case, I think the commission and the arbitrator made a mistake. Dr. Terry had all of the same information that Dr. Levin had. The claimant testified that these – Does that mean that because he had the same information, they had to believe him? No. I'm not saying that. But what I am saying is Dr. Terry testified that he reviewed that information with her in great detail, that they discussed her job duties and what she had to do. He even went further and we pointed out that he was a mechanical engineer prior to being a lawyer, that he had some special knowledge that would have aided him in the ideas of the force and the impact of her body and her weight pushing down on these pedals, that would have aided not only from a mechanical engineering perspective, but also from a medical perspective. He was uniquely in a situation to put those two disciplines together and come up with an opinion after several conversations with her concerning her work duties. How do you overcome the well-settled rule that it's within the province of the commission to judge the credibility of the witnesses and determine the weight to be given to the evidence? Well, I think first you, well, first you back up I think and look at the accident issue, which they found there was no accident. I think if you get past that and find that although her work activities were varied, they were repetitive on a daily basis, you get to this issue now. The way you overcome that is there has to be some medical information upon which the commission relied in order They had Dr. Levin, right? Well, they had Dr. Levin, but you have to look at his opinion. Dr. Levin also had these pictures to look at, but they're never referenced in his report. And then on cross-examination for the first time, he says, yes, she did bring those pictures. He had absolutely no independent recollection of having discussed those photographs with her and what her job activities were. Instead, his report is couched with very careful language. I do not know what activities could have contributed to this from work. Well, you've got an opinion from him saying that her normal daily activities are the cause of her progressive knee condition resulting in the need for surgery. If that's the case, what are her normal daily activities? There has to be a basis somewhere in the record of what those normal daily activities are in order for his opinion to have any credibility or any weight. And I think the commission got it wrong here because there is no evidence what her normal daily activities were. Wasn't that your problem with Dr. Terry? I mean, as far as it being repetitive trauma, he testified that he'd seen the pictures and so forth, but he didn't know how many times a day she had to squat, how far she had to walk, how many times she had to push the workstation, how much it weighed. Those were the things he testified he didn't know. That's true, Your Honor. And that's why they discounted his testimony, right? Well, I don't know that they specifically said that, but in addressing that argument, in my brief I cite the Freeman case, which indicates that that is not a requirement, that he has to know the exact breakdown of the number of times she did specific things. He had an idea that over the course of 20 years she performed these same activities day in and day out, and that those were sufficient. Now, if you compare her daily activities at work to her undefined, unknown daily activities, you find that just looking at the work she did on this press alone where she pushed down with her right foot every day, she did that 600 to 660 times per week. That's over 31,000 to 34,000 times a year. Over the course of her 20 years there, that's over 624,000 to 686,000 times over this period of time. We know she did that. The doctors know she did that. What do we know about her daily activities? What activities did she perform at home that dwarfed these activities that she did at work? There's no indication. I could see if the commission could say she was a runner, she was a member of her local community's running club and she ran marathons, and that could have contributed. Or she was a member of the clean and jerk club of the weightlifting team at her gym. Those might be activities that might be helpful in saying, yes, her normal daily activities contributed in some way, but we don't know what her normal daily activities were. There's no evidence of what they were. You're proceeding on the theory that the work activities aggravated or accelerated the preexisting condition. That's correct. And caused the condition of well-being. It was accelerated by the work responsibilities. That's absolutely correct, Your Honor. Is that not what Dr. Robinson stated? Dr. Robertson, yes. Robinson, yeah. How did the commission just say of no probative value? What's the basis for that? Your Honor, I wish I could tell you. I haven't seen a decision like this where the treating physicians have been so readily discounted and dismissed. Based on the opinion of a man, Dr. Levin, who every time he was cornered to a point, for example, where he admitted that the types of activities that she did at work, the bending, the squatting, the stooping, if somebody who had arthritis in her knee performed those activities, it could aggravate the condition of arthritis in her knees. But when specifically pressed, well, how about her? When she did those activities at work, did it aggravate and accelerate the underlying condition in her knees? He wouldn't answer the question. And yet the commission based the decision on this. But you have that question answered by two other doctors, don't you? It had been. That's correct. All right. We also asked him to clarify, how can you say that not, that absolutely no activity whatsoever from her job contributed to her condition? He would not answer that question, despite the fact that his report said absolutely no impact her job activities on the condition of her knees. I think, I'm not going to stand here and say this happens very often. I think the commission just got this one in particular wrong. Why don't you argue in CISPRO? Pardon? Why don't you argue in CISPRO in this situation? I didn't think that that, I thought that that was a situation that was established. She had a prior, the doctor testified she had a pre-existing condition in her knees of arthritis, that the underlying condition was aggravated and accelerated. I didn't think that that's where the commission had the problem. I thought the commission's problem, what the commission decided was that because the work activities were varied, therefore, this cannot be a repetitive claim, because that's what their decision said. And as I said, the City of Springfield case came out shortly after the commission's decision. I was hoping that that might have been addressed in the circuit court. As you know from looking at the order, it was a one-paragraph order confirming the commission's decision, so we didn't get clarification there. But I think that the facts of this case need to be applied in light of this court's holding in City of Springfield. Thank you. Thank you. Counsel, please. Members of the court, Mr. Popelka, my name is Bob Alwick. I represent the Applee Hardshaft Remarks. There's one question I'd like to kind of respond to, and that was the question about Dr. Robinson. They've never objected to that finding. In the circuit court, the commission, the briefs they filed, they never argued that that decision, part of the decision finding that report to be of no probative value was wrong. When we went to the circuit court, they never argued that that decision regarding Dr. Robinson was wrong. And if you look at the briefs today in this court, they don't even mention Dr. Robinson's name. I think it was an excellent question, but I want to make the record clear that that's an issue. It's an issue that's never been filled with. How did this case start? The case started because Ms. Holyfield had a revelation. She talks about the revelation on page 49. She's filling out insurance papers because she's getting treatment for her knees. She seems generally puzzled that at 57 years of age, her knees are also 57 years of age. So she's filling out these forms, and this is what she says. She says, I realize I'm not athletic. I hadn't had any accidents or anything to cause me problems with my knees. I wasn't engaged in anything really physical to cause me problems, cause me injuries. It must be at work. Well, that's kind of a look-back approach, but it's that look-back approach that's kind of driven this case. The petitioner testified about her job duties. She's a receiving clerk. She actually sits at a table. And what she does is she goes along these stacked rolls of cloth, and she pulls tickets. And the way she described it is that sometimes she has to lean back with her back to pull them. Sometimes she drops them. Sometimes she has to pick them up. But basically, it's a sitting job. They rely on Dr. Terry. Dr. Terry's reports and evidence. Mr. Papalka quarreled with Dr. Levin because Dr. Levin did not mention reviewing photographs in his report. Dr. Terry doesn't mention looking at photographs in his report. This is what she told him. I'm constantly pushing, pulling, and modifying my position at work. That's his opinion. Pushing and pulling. So I asked him on cross-examination. Now, keep in mind that they're telling you that Ms. Holyfield sat down with this doctor and gave him a very detailed description of everything she does. That's interesting because the one thing she never mentioned, he never recorded, and he was never asked one question about it in 55 pages of a deposition. He was not asked one question about the pressing job. The centerpiece of their argument today is the pressing job. They did mathematic equations about the thousands of times she did it. At some point in time, they asked the doctor about that. When did he put that in his report? When he testified to it? No, no, and no. You mentioned Dr. Robinson's report. The interesting thing about that is if you look at the dates. Dr. Robinson saw her one month before we took the deposition of Dr. Carey. One month. In that report, she does tell him about the pedals. If they knew about that as part of their case, if they had an opinion making that as part of their case, then why wouldn't they ask a doctor under oath about that part of the case? Could the commission have inferred that Dr. would have said, there's no causal connection between that and these two torn meniscuses? I think that's a legitimate inference. So Dr. Carey talks about pushing and pulling. So I ask him about pushing and pulling. Doctor, how often would she have to pull? Oh, I don't know about that. Well, what kind of distances does she have to pull? I don't know about that either. What about squatting? No, I don't know much about that. She's telling him the history of walking up and down stairs. The light bulb goes off. He says, yeah. She's talking about walking up and down stairs. The one thing she never testified to in arbitration was problems walking up and down stairs. But he says, oh, yeah. She told me about that. Counsel, you seem to be saying, in essence, that even though Robinson and Terry provided causal connection opinions, their opinions are flawed. Is that sort of what you're saying here? Yes, and I'm basically saying I think the commission can look at this, look at his testimony on direct examination and cross-examination, look at his report, look at Dr. Levin's opinion. They seem mesmerized by the fact that somebody in Illinois can actually get hurt at home. This is what their doctor testified to. This is what their doctor testified to. Question, is it your opinion, doctor, within a reasonable degree of medical and surgical certainty that her knee could be aggravated by activities at home? Yes. Have you ever treated patients with the types of findings that Ms. Holyfield had, whose condition was solely related to non-work-related conditions? Yes. I mean, we treat people who are unemployed outside of the house. They have knee problems all the time. And I said, doctor, they developed the same type of problems that Ms. Holyfield had developed. Answer, in general, you can see this in non-working patients as well. Why can't the commission look at that and go, well, you know what, he says that within a reasonable degree of medical and surgical certainty, this could have happened solely at home. My doctor says it could happen solely at home. Why can't you add those two up and go, you know what, there's support in this record for this decision. Well, it has a superficial appeal. How do you respond to his argument that there's no evidence in the record as to what activities involved her knees outside of the workplace? Well, that's interesting. Because the first treating doctor, Dr. Gilleen, report, August 23rd, 2006. On presentation, the patient continued to complain of pain in both the right and left knee. She is unable to perform housework as desired, end of quote. Doesn't say she got hurt at home, but the one thing she doesn't mention is anything at work. And that's the August 23rd, 2006 report. In the final analysis, the reason they have the burden of proof is because they're the only ones who control that information. You're right. I don't know what she does at home. I don't know if she's a weightlifter. I don't know. That's why they have to carry the burden of proof. I don't have to prove that's related to something else. They have to prove it's related to this. The commission looked at this and said, you know what? Weighing it all together doesn't add up. And I think they got it right. And I'm asking that it be confirmed. Thank you. Roberto, please. Your Honor, what the evidence does show is that she testified that her knees hurt while performing her activities at work. There is no evidence that she had any problems with her knees doing any of her household chores or any of her normal daily activities. That's an important fact for the commission to consider and for this Court to consider. We did meet our burden of proof by showing by her at before the commission a preponderance of the credible evidence. My knees hurt at work as I bend down and squat next to these nestainers, as I push down on the pedal, as I do the various activities that I do. Every single roll of fabric processed by the Illinois Hardshaft and Remarks Company went through her. She was the only person to perform this job. She testified to perform it fast. She's busy all day long. It isn't a job where she's sitting around all day. It's a job that has her doing several different activities throughout the course of the day. But from day to day, there's no variation in those activities except potentially for the number of times. One day she testified. There's a lot of variation. I mean, she may have one or two nestainers one day. She may have ten another. She may have four to seven one day or 20. She walks to the copying machine, walks back. You know, she does different activities throughout the day. Is that right? There are different activities, but there are main activities. Sometimes pushing the pedal on the fabric machine, that may be a small part of the day. Sometimes it might be a big part of the day. Is that correct? That generally tends to be at least an hour and a half to three hours of the day. It has to be done before noon so that there's also a time limitation on the time she has to be testing the fabric. Because as these nestainers come in and she enters them in, they then go into the plant for processing. They come back to her a second time where she's bending, squatting. Why would that be the focus of your case? Pardon? Why would that be the focus of your case? It seems like we've got a shotgun approach here, and it seems like the machine is a rifling approach. I mean, you've got some impressive numbers that you're at least arguing today. But that's just my observation question. I think it's the cumulative effect. There are certainly the work that she does on this press machine. They are very impressive numbers for a woman who's 5'2 to have to get the torque in order to push down on this. But beyond that, the other activities that she does throughout the course of the day, pushing the workstation from nestainer to nestainer a distance of some 40 to 50 feet and then back again, hitting grooves on the floor and debris and stopping, it took a lot of effort to push that. It starts with the pain from the pressing machine. But then the other activities, although varied, also put a lot of pressure on the knees and wear and tear on the knees. And those activities, though varied throughout the day, are the same activities she performs every Monday, Tuesday, Wednesday, Thursday and Friday that she works. With respect to this revelation that she had concerning her work activities, I don't think that was a fair term. It was not her revelation. She had an insurance form that she took to Dr. Miranzada to fill out. And that's when Dr. Miranzada sat her down and said, well, let's figure out what it is that caused this condition. And they sat down and discussed it. That discussion is in the record. It's also reflected in his medical records. It wasn't her revelation. It was something she sat down with the doctor and the doctor developed with her. And at that point, it became clear to her that I don't do outside activities. I don't do athletic activities. I don't do other things. It must be the work that I'm performing at home. Thank you. The court will take the matter under advisory for disposition.